## MITCHELL ENERGY CORPORATION, and Blackhawk Energy, Inc., Plaintiffs,

v.

## MARY HELEN COAL CO., INC., Defendant.

Civ. A. No. 80–1052.

United States District Court, District of Columbia.

Oct. 13, 1981.

C. Francis Murphy, Iverson O. Mitchell, III, Wilkes & Artis, Chartered, Christopher A. Byrne, Charles A. McNelis, Washington, D. C., for plaintiffs.

Salvatore A. Romano, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Defendant has moved to dismiss the complaint on the grounds of lack of personal jurisdiction over defendant Mary Helen Coal Co., Inc., (Mary Helen), under the District of Columbia long-arm statute; lack of subject-matter jurisdiction because the complaint fails to allege the principal places of business of plaintiffs Mitchell Energy Corporation (Mitchell), and Blackhawk Energy, Inc., (Blackhawk), and erroneously alleges that Blackhawk is incorporated in the District of Columbia, thereby failing to establish diversity jurisdiction; and improper venue because Blackhawk is not incorporated in the District of Columbia.

For purposes of the motion and as outlined from the pleadings, the facts are as follows. On April 10, 1979, plaintiff Blackhawk and defendant entered into a written contract, (April 10 Agreement), whereby Mary Helen agreed to sell, and Blackhawk to purchase, 85,000 tons of coal, contingent upon Blackhawk being selected as a supplier of the Defense Fuel Supply Center (DFSC) in Alexandria, Virginia under a certain government solicitation. The coal was to meet specifications described in the contract, and was to be delivered to six locations, five in Washington, D.C. and one in Alexandria, Virginia. The agreement provided for a price of $37.00 per net ton, f. o. b. rail cars at mine. Defendant's mines are in the vicinity of Belfry, Kentucky.

However, plaintiff Mitchell Energy, and not Blackhawk, was the successful bidder on certain portions of the specified solicitation, and was awarded a contract calling for the delivery of up to 77,000 tons of coal to designated government installations. After a period of negotiation, a new agreement, dated October 3, 1979, (October 3 Agreement), and entitled Supplement to and Amendment of Contract Dated April 10, 1979, was entered into by Blackhawk, Mitchell, and Mary Helen. That Agreement recited that as the principals of Mitchell Energy were identified in all respects to the principals of Blackhawk Energy, Blackhawk assigned all its rights and interest in

560

the April 10 Agreement to Mitchell. Further, the Agreement incorporated the April 10 Agreement except for enumerated changes, which included the total quantity of coal to be delivered (now 67,000 tons), and elimination of one of the District of Columbia delivery points. Previous to the October 3 Agreement, an Escrow Agreement dated August 21, 1979, was executed by the parties, delineating the method of payment for the 67,000 net tons of coal.

It appears from the complaint that defendant began coal deliveries prior to the October 3 Agreement. Plaintiffs state that deliveries began shortly after the award of the DFSC contract to Mitchell, which was in July of 1979, and that in or about August 1979, Mitchell was notified by DFSC that the coal was not meeting the specifications for the percentage of volatile matter, dry. Complaint ¶ 10. Defendant has stated that coal deliveries began in mid-July.

The gravamen of plaintiffs' complaint is that Mary Helen repeatedly breached the contract by shipments of non-conforming coal. In November of 1979, plaintiffs allege, DFSC informed Mitchell that no further shipments of coal from Mary Helen would be accepted under the contract due to volatile matter exceeding 38 percent.

Mary Helen Coal is a corporation organized under the laws of the state of Kentucky, with its business office located in Indianapolis, Indiana. Its mining operation is in Belfry, Kentucky, and it operates several coal mines within a ten mile radius of Belfry. It is undisputed that Mary Helen is not authorized, registered, or licensed to do business in the District of Columbia, nor does it maintain a registered agent here. It has never maintained an office, an agent for transacting business, a telephone listing, mail box, or bank account in the District. Nor has it ever possessed, leased, or owned property here. It does not regularly solicit business or advertise in the District of Columbia. Mary Helen has been listed as a supplier of coal in the Keystone Coal Industry Manual, which is distributed nationally, including Washington, D.C. Defendant has dealings with only one customer which has

an office in D.C., and in that case the initial contact was made through that company's West Virginia office, and all coal was delivered to a point in Virginia for export. Some orders were placed with defendant in Indianapolis by telephone from the company's Washington, D.C. office.

Defendant asserts that the above factors render it impossible to subject it to jurisdiction in the District of Columbia for general purposes on the basis of "doing business" here, and that its dealings in the transaction at issue do not constitute "transacting any business in the District of Columbia" for the purposes of the D.C. long-arm statute, D.C. Code § 13–423, so as to render it amenable to suit here on claims arising from the instant transaction.

As to this transaction, defendant has asserted, and it is not disputed, that the initial solicitation was made to Mary Helen in Indianapolis by a third party broker located in Ohio on behalf of Blackhawk. Subsequently, Blackhawk contacted Mary Helen directly. The April 10 Agreement was drafted and executed by Blackhawk and mailed to Mary Helen in Indianapolis, where it was signed and returned to Blackhawk by mail. The only time any agent of defendant was present in Washington, D.C. in connection with this contract was when two of defendant's employees had a meeting with Iverson Mitchell, Jr., an officer of both Blackhawk and Mitchell, to discuss various questions relating to the contract. The importance of this meeting is the subject of serious dispute between the parties. Defendant claims that only the terms of an escrow agreement and consideration of a price escalation provision were discussed, and that nothing was finalized, signed or executed at that time. Plaintiffs, whose argument for jurisdiction rests largely upon defendant's presence in the District for this meeting, claim that the purpose of the meeting was to renegotiate the April 10 Agreement and negotiate the terms of the Escrow Agreement and the October 3 Agreement, and that the meeting did in fact lead in a very substantial way to the October 3 Agreement and the August 21

Escrow Agreement. Defendant asserts that the final terms of the October 3 Agreement were in fact negotiated at a meeting at its office in Indianapolis, and the Agreement was executed by all parties there that same day.

In further support of its argument that the loci of its activities in relation to this contract were Kentucky and Indianapolis, and not Washington, D.C., defendant points to the facts that the coal was shipped f. o. b. rail cars at mine in Kentucky, that defendant transferred title to the coal to plaintiff at that point, and did not pay for shipping beyond there, and that the testing facilities for determining whether the coal met specifications were also in Kentucky. Therefore, defendant concludes, the only connection of the District of Columbia with this transaction is that it is where the plaintiffs happened to be located. Defendant did not, it claims, transact any business in the District which could subject it to the jurisdiction of this Court.

Plaintiffs, on the other hand, insist that the presence of defendant's agents in Washington for what they term an essential contract negotiation session, combined with telephone and mail communications between the parties in Washington and Indianapolis, is sufficient to confer jurisdiction based upon the transaction of business. Plaintiffs further bolster their jurisdictional claim pointing to the delivery of most of the coal to points in the District of Columbia, and defendant's appearance in the national coal industry publication.

■ The Court finds that defendant's contacts with the District of Columbia are not sufficient to support jurisdiction under D.C. Code § 13–423 or under the Due Process Clause of the Fourteenth Amendment.

■ The party seeking to invoke federal jurisdiction has the burden of establishing that it exists. The plaintiff need only make a *prima facie* showing of jurisdictional facts to prevail; otherwise a defendant could obtain a dismissal simply by controverting the facts established by plaintiff through affidavits. However, if the submitted materials raise questions of credibility or disputed questions of fact, the Court may take evidence at a preliminary hearing to resolve these issues. At such a hearing, plaintiff must establish the jurisdictional facts by a preponderance of the evidence. *Data Disc, Inc. v. Systems Technology Associates,* 557 F.2d 1280 (9th Cir. 1977). In this case, although at first blush it appears that important factual matters are in dispute, a closer examination of the entire record reveals that resolution can occur without an evidentiary hearing.

The first apparent factual dispute concerns where the October 3 Agreement was signed. Plaintiffs' assertions in this regard are curiously self-contradictory, and ultimately support defendant's version of the facts. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss and the accompanying affidavit of Josephine Mangiapane, President of Blackhawk Energy, state that the October 3 Agreement was executed in the District of Columbia on behalf of Mitchell and sent via mail to Mary Helen for signing in Indianapolis. Defendant, on the other hand, supported by the affidavits of Charles Stewart and George Davis, who purport to have been present at the time, claims that the Agreement was executed at its office in Indianapolis. Defendant's affiants also assert, and plaintiff does not deny, that Josephine Mangiapane was not present at the October 3, 1979 meeting in Indianapolis. The affidavit of Iverson O. Mitchell III, who was present at that meeting on behalf of plaintiffs, confirms defendant's version of the facts, that is, that the agreement was signed on October 3 in Indianapolis. Plaintiff did mail from Washington, D.C. at a later date a copy of the executed government contract award to Mitchell Energy to be appended to the Agreement. This version of the facts, supported by representatives of both sides who were actually present, will be credited. The fact that the contract which is the source of this litigation was fully executed in Indianapolis, although by no means dispositive in itself, lends support to defendant's argument that jurisdiction does not lie in the District of Columbia.

The second apparent factual dispute, referred to earlier, concerns the matters discussed at the meeting of August 2, 1979 and their significance. The chronology of events related by the parties reveals that at that time, Mary Helen was making shipments of coal to plaintiffs in accordance with the April 10 Agreement, even though the April 10 Agreement was contingent upon Blackhawk being awarded the government contract, and in fact Mitchell had been awarded the contract in mid-July. According to the affidavit of Iverson O. Mitchell, III, a representative of plaintiff at the August 2 meeting, the meeting was requested by Mary Helen to discuss and clarify several matters relating to the April 10 Agreement and to negotiate a final sales agreement. Matters discussed, according to Mr. Mitchell, were the procedure for payment, an escrow agreement, the assignment of the proceeds of the government contract, and the effect of standard labor escalation clauses in government contracts. At the conclusion of the meeting, an escrow agent and method of payment were agreed upon and it was understood that Mitchell Energy would be responsible for the preparation of a final sales agreement along the lines discussed, and an escrow agreement which would include Mary Helen as a party. Several days following the meeting, Mr. Mitchell completed a draft of the escrow agreement, which was apparently accepted by Mary Helen without amendment and executed August 21, 1979. There were however, several telephone conversations between Mr. Mitchell and representatives of defendant concerning changes which the defendant desired in the content of the final sales agreement.

Defendant's version, supported by the affidavits of George Davis and Charles Stewart, both of whom were present at the August 2 meeting representing defendant, is that the only matters discussed at the meeting were consideration of a price escalation provision in the agreement, the inclusion of Mary Helen as a party to the escrow agreement, and receipt by Mary Helen of an acknowledgement by an agency of the United States government of the assignment of the proceeds of the government contract to the escrow agent.

Examination of the two versions reveals that in fact there is little conflict as to the subject matter actually discussed at the meeting. The real difference is in the parties' characterization of this same discussion; plaintiffs viewing it as an essential step in the negotiations process, leading directly to the Escrow Agreement and the October 3 Agreement, while defendant sees the meeting as one in which rather peripheral matters were discussed, and nothing of substance decided.

Plaintiffs argue that defendant had no contract with plaintiffs at all before the August 2 meeting, the April 10 Agreement being contingent on Blackhawk being awarded the government contract, which it was not, and Mitchell Energy not being a party to that Agreement. A contract must have been formed at the August 2 meeting, plaintiffs reason, since the August 21 Escrow Agreement recites that Mitchell had agreed to purchase 67,000 net tons of coal from Mary Helen. This argument, however, loses its force in light of the facts that Mary Helen was already supplying coal under the contract before the August 2 meeting, and that the principals of Blackhawk and Mitchell are exactly the same. A more plausible view of the situation is that the parties assumed that they had a contract, and in fact were performing under it, even though Mitchell, rather than Blackhawk had been awarded the government contract. Certainly a new writing was required to reflect the change in parties and tonnage, and an escrow arrangement, referred to in the April 10 Agreement, needed to be formulated. However, it certainly cannot be said that defendant, in coming to the District of Columbia for this meeting, was attempting to form an entirely new contract or business relationship.

On the issue of how directly the talks on August 2 led to the October 3 Agreement, the documents speak for themselves. The draft Supplement to and Amendment of Contract dated April 10, 1979, (Exhibit A to the affidavit of Iverson O. Mitchell III),

which was based upon discussions at the August 2 meeting and subsequent telephonic communications, and presented at the October 3 meeting in Indianapolis, differs substantially from the document that was actually signed October 3. There are differences as to total tonnage and specifications for the coal. Provisions in the draft regarding Mary Helen's responsibility if the government were to reject the coal, liquidated damages, plaintiff's right to rescind the contract in the eventuality of government rejection, and economic price adjustment/price escalation do not appear in the final version. Unquestionably, major issues regarding the contract were finally resolved October 3 in Indianapolis and not August 2 in Washington. In fact, the only matters that appear to have been finally resolved at the conclusion of the August 2 meeting were in all likelihood foregone conclusions even before that meeting. These are the substitution of Mitchell as party to the contract, the incorporation of the April 10 agreement except for specified amendments, and the delivery points and quantities specified in the government solicitation. An escrow arrangement, provided for in the April 10 agreement, was fleshed out. Considering also the fact that an agreement, based upon the April 10 agreement, though incomplete, existed and actually was being performed before the August 2 meeting, it cannot be concluded that that meeting was of great significance to this transaction.

■ No other facts material to the issue of *in personam* jurisdiction over defendant being disputed, we proceed to apply the law to the facts as outlined above. The "transacting business" clause of the Washington, D.C. long-arm statute permits jurisdiction to the fullest extent permissible under the Due Process Clause. *Mouzavires v. Baxter*, 434 A.2d 988 (D.C.App.1981) (*en banc*). The due process analysis requires a determination as to whether there is "a sufficient connection between the defendant and the forum State to make it fair to require defense of the action in the forum." *Id.*, quoting *Kulko v. Superior Court*, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978).

Despite the broad reach of the District of Columbia long-arm statute, the case law makes it clear that not every person who does business with a D.C. corporation is to be swept in. The seminal case limiting *in personam* jurisdiction over foreign corporations in the District is *Environmental Research International Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C. App.1976). The defendant in that case, which had no other significant contact with the District, was solicited at its home office to contract services from plaintiff D.C. corporation, which services were performed in the District of Columbia. Because of the doctrine that entry into the District of Columbia by non-residents for purposes of contacting federal governmental agencies is not a basis for the assertion of personal jurisdiction, the only occasions of defendant's presence in the District in connection with the contract were not supportive of jurisdiction. The court found, relying on *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), that jurisdiction may not rest on plaintiff's activities in the forum, but that defendant must perform some purposeful activity there.

■ A single act in the jurisdiction by defendant, under some circumstances, may be sufficient to constitute "transacting business", and thereby confer jurisdiction. *Mouzavires v. Baxter, supra*. Plaintiffs rely upon cases holding that contract negotiations in the forum state, even where defendant has no other contacts, are purposeful activity in the forum sufficient to subject the defendant to its jurisdiction. *Doyn Aircraft, Inc. v. Wylie*, 443 F.2d 579 (10th Cir. 1971); *Data Disc, Inc. v. Systems Technology Associates, supra*. Such cases generally involve a course of negotiations, however, one negotiation session in the forum, combined with a continuing series of letters and telephone calls to the forum, were found sufficient for the assertion of jurisdiction in *McLaughlin v. Copeland*, 435 F.Supp. 513 (D.Md.1977). (The District of Columbia courts take guidance from the neighboring jurisdictions of Maryland and

Virginia in the interpretation of their long-arm statute. *Environmental Research International, supra.*) In *McLaughlin,* the Court applied a three step test to determine when *in personam* jurisdiction could be based upon a single act. First, the defendant must purposefully avail himself of the privilege of acting in the forum state. Second, the cause of action must arise from the defendant's activities there. Third, the acts of the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction reasonable. The Court found in that case, where defendant attorney entered the jurisdiction for a negotiation session to discuss the settlement of a lawsuit, out of which meeting the claim directly arose, that all three tests were met and jurisdiction would lie on the basis of "transacting business." However, single contacts with the jurisdiction which are insignificant in the scheme of the parties' dealings will not support jurisdiction. *Textile Museum v. F. Eberstadt & Co.,* 440 F.Supp. 30 (D.D.C.1977); *Bueno v. La Compania Peruana de Radio-Difusion,* 375 A.2d 6 (D.C.App.1977); *Concrete Detailing Services Inc. v. Thomsson Steel Co.,* 411 F.Supp. 1021 (S.D.N.Y.1976).

Returning to the instant case, defendant did not solicit plaintiff in Washington, D.C. Rather, the solicitation went from plaintiff to defendant in Indianapolis. The contract was not to be performed by defendant in the District. The coal was mined, tested, and loaded onto rail cars, at which time plaintiff took title, in Kentucky. It is true that the destination of most of the coal was Washington, D.C. but defendant's role in the transaction had ended before it reached here. The breach of contract, that is supplying coal which failed to meet specifications, if it occurred, occurred in Kentucky. The documents reflecting the contract, the April 10 Agreement, the Escrow Agreement, and the October 3 Agreement, were either signed by each party in its own jurisdiction and exchanged through the mail, or in the case of the October 3 Agreement, the final agreement of the parties, fully executed in Indianapolis. Exchange of letters and telephone communications with a party

in the District of Columbia alone is not considered a jurisdictionally significant contract by District of Columbia courts. *Environmental Research International v. Lockwood Greene Engineers, Inc., supra; Textile Museum v. F. Eberstadt & Co., supra.*

The one meeting which brought defendant to the District of Columbia, the negotiation session of August 2, 1979, because of its minimal significance, does not take this case out of the rationale of *Environmental Research International, supra,* declining jurisdiction where an out-of-state corporation having no other significant contacts with the District is solicited by a D.C. corporation at its home office, and the contract is performed by defendant outside of the jurisdiction.

The Court finds that defendant's activities in the jurisdiction do not constitute "transacting business" under D.C. Code § 13–423, and that subjecting defendant to the jurisdiction of this court based on its extremely limited contact with the District of Columbia would violate the requirements of due process set forth by the Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and *Hanson v. Denckla, supra.*

Since the case will be disposed of on the basis of jurisdiction, it is unnecessary to reach the other grounds advanced by plaintiff as requiring dismissal.

■ Even without jurisdiction over the defendant, the Court may transfer rather than dismiss the case, to avoid the injustice which could result from the dismissal of an action merely because an erroneous decision has been made on a close jurisdictional question. *See Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), (upholding transfer of venue by a court not having personal jurisdiction over the defendant); *Textile Museum v. F. Eberstadt & Co., supra.* The most logical place to which to transfer is the Eastern District of Kentucky where there is a pending action between these parties, essentially the counterclaim to this case. *Mary Helen Coal Company v. Mitchell Energy Corpora-*

*tion*, Civil Action No. 80–112. Defendants' (plaintiffs in this case) motion to dismiss for lack of *in personam* jurisdiction, or in the alternative, for a change of venue to Washington, D.C. is pending in that case. That motion is being held in abeyance by Judge Unthank until the decision on the motion in this case. Under 28 U.S.C. § 1406(a), the Court may transfer a case to any district or division in which it could have been brought. This claim could have been brought in the Eastern District of Kentucky. Jurisdiction and venue would be proper, as defendant is a Kentucky corporation. 28 U.S.C. § 1391(c). Although the Kentucky Court may find that plaintiffs here may not be sued as defendants in Kentucky, they certainly may bring a case as plaintiffs there. If Mary Helen's Kentucky action is dismissed for lack of jurisdiction over Blackhawk and Mitchell, Mary Helen could assert its claim as a counterclaim to this transferred action. It might be said that it is unfair to force plaintiffs to litigate this claim and a likely counterclaim in Kentucky when they possibly could not have been forced to defend the counterclaim as an original suit there. However, plaintiffs must bring suit in a jurisdiction where defendant is legally amenable to suit. The only apparent jurisdiction where both plaintiffs and defendant would be amenable to suit is Indiana, where Mary Helen has its place of business, and where Mitchell and Blackhawk would be reachable under the Indiana long-arm statute, Indiana Rules of Procedure, Trial Rule 4.4(A)(1), as "doing any business" in the state. As plaintiffs initiated the business relationship which is the subject of this lawsuit by contacting defendant in Indiana, and the October 3 Agreement was fully executed in Indiana, jurisdiction over plaintiffs would not be problematical there, had defendant chosen to bring its claim there instead of Kentucky. However, defendant has in fact brought its claim in Kentucky, and a lawsuit based upon the same transaction is now pending there, favoring the Kentucky court over Indiana. Moreover, it appears that Kentucky may be more convenient for plaintiff than Indiana. There is a contradiction in the record as to the location of the principal place of business of Mitchell Energy. Plaintiffs state in their Opposition to Defendant's Motion to Dismiss (at 12) that Mitchell has its principal place of business in the District of Columbia. However, the attached affidavit of Josephine Mangiapane states that Mitchell's principal place of business is Red Jacket, West Virginia, which, defendant has pointed out, is 25 miles from Belfry, Kentucky. Red Jacket is the home of Iverson Mitchell, Jr. who is the President and Treasurer of Mitchell and was the President and Treasurer of Blackhawk during the period in which the events relevant to this action occurred. As plaintiffs own papers contradict themselves on a point relevant to the convenience of a Kentucky forum, plaintiffs' statement that a Kentucky or Indiana forum would be inconvenient to them cannot be given great weight.

For all of the foregoing reasons, this case will be transferred to the Federal District Court for the Eastern District of Kentucky. An appropriate order accompanies this memorandum opinion.