Thomas K. DELAHANTY, et
al., Plaintiffs,

v.

John W. HINCKLEY, Jr., et
al., Defendants.

James Scott BRADY, et al., Plaintiffs,

v.

John W. HINCKLEY, Jr., et
al., Defendants,

Timothy John McCARTHY, Plaintiff,

v.

John W. HINCKLEY, Jr., Defendant.

Civ. A. Nos. 82–409, 82–490,
82–549 and 82–866.

United States District Court,
District of Columbia.

July 3, 1986.

Robert Cadeaux, Washington, D.C., for Thomas K. Delahanty, et al.

Jacob Stein, Washington, D.C., for James Scott Brady, et al.

Paul D. Kamenar, Washington Legal Foundation, Washington, D.C., for Timothy John McCarthy.

Vincent J. Fuller and Judith A. Miller, Washington, D.C., for John W. Hinckley, Jr.

Peter A. White, Washington, D.C., for RG Industries, Inc. et al.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

The Court has filed an order dismissing the actions against RG Industries, Inc. and ROEHM GmbH. In this memorandum, the Court briefly sets forth the grounds for its order.

## I

Plaintiff bears the burden of proving facts sufficient to support jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182, 56 S.Ct. 780–82, 80 L.Ed. 1135 (1936). Where a defendant's challenge to the facts initially set forth by the plaintiff raise a genuine issue of fact, then the Court may hold an evidentiary hearing. Plaintiffs must then establish facts which support jurisdiction by a preponderance of the evidence. *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977), *Mitchell Energy Corp. v. Mary Helen Coal Co.*, 524 F.Supp. 558, 561 (D.D.C. 1981).

In this case, plaintiffs have resorted to unusual sources to prove the presence of defendants' products within the District. They have relied on certain studies and computer printouts prepared by the Bureau of Alcohol, Tobacco, and Firearms (BATF), and the District of Columbia Metropolitan Police Department (DCMPD), which purports to indicate the extent to which Roehm and RG products are used by criminals and/or trafficked illegally, as well as defendants' knowledge of those events.

Defendants argue that plaintiffs have not submitted competent testimony to explain how the printouts were compiled, and how they are properly interpreted. The studies appear to be compilations of statistics of official traces of defendants' weapons. RG is required by law to provide BATF with this registration information, which they do on almost a daily basis.

If plaintiffs are able to properly authenticate these printouts, present a witness competent to testify as to their preparation and contents, and have these admitted into evidence, these documents will support a finding that defendants' nationwide distribution scheme has been successful in indirectly distributing large numbers of their handguns in the District of Columbia. For the reasons stated herein, the Court finds that, if admissible, these statistics would support jurisdiction.

*Adjudicatory Authority Over the Defendants*

The jurisdiction of this Court to enter a valid judgment against a non-resident defendant depends upon a two-pronged inquiry. First, whether the assertion of jurisdiction would offend the Due Process clause of the Fifth Amendment; and second, to what extent the local rules of "competence" have exercised that jurisdiction which is constitutionally permissible. *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty Ltd.*, 207 U.S.App.D.C. 375, 378, 647 F.2d 200, 203

(1981) (hereinafter that case will be referred to as "German Wine").

### A. The Due Process Inquiry.

■ The Due Process clause requires the defendant to have sufficient minimum contacts with the forum to make it "reasonable and just, according to our traditional conception of fair play and substantial justice" to require the defendant to litigate there. *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). In *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), the Court held that to satisfy this requirement, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." As *International Shoe* and subsequent decisions caution, this criteria cannot be mechanically or quantitatively applied. 326 U.S. at 319, 66 S.Ct. at 160. Whether jurisdiction lies will fluctuate with "the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." 326 U.S. at 319, 66 S.Ct. at 160.

Moreover, the Supreme Court has recently made clear that it is not solely the benefit and protection of the laws afforded the *defendant* which makes it fair to assert jurisdiction. The state's *own* legitimate interest in holding persons answerable for allegedly tortious conduct is also a factor to be weighed in the due process equation. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–703, n. 10, 102 S.Ct. 2099, 2104–2105, n. 10, 72 L.Ed.2d 492 (1982), *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Where there is a minimum of some purposeful, affirmative conduct by the defendant which has an affect in the forum state, the state's legitimate interest in enforcing its laws may tilt the balance in favor of jurisdiction. *Keeton*, 104 S.Ct. at 1479. This factor serves as a "surrogate" for other contacts which may be lacking. *Id.*

Defendants argue that, in this case, the requisite minimum contacts to support the District of Columbia's exercise of jurisdiction are missing. Defendants have no officers or agents here, and are not licensed to do business here nor, it is submitted, could they "purposefully avail themselves" of this market because of the Firearms Act, 6 D.C.Code Ann. § 2301 *et seq.* They contend that under these circumstances, they could not have reasonably anticipated having to defend here.

These arguments attempt to obscure the reality of defendants' marketing efforts. It is clear that both defendants purposefully engaged in a nationwide distribution scheme in order to avail themselves of the widest possible market. RG is the United States importer for Roehm's products. Between 1974–1983 it is estimated that RG distributed 1,187,446 of guns manufactured by Roehm.

RG distributes to approximately 140 wholesalers throughout the United States. RG does not sell to any dealers in the District of Columbia, but it is active in the District of Columbia metropolitan area. Approximately .53% of sales in 1982 were to wholesalers in Maryland, while .84% were to Virginia clients. Those businesses are located in various communities in Virginia, as well as Maryland. .5% of all sales were delivered to nearby Laurel, Capitol Heights and Landover, Maryland.

Moreover, if plaintiffs' proffer were sustained by the evidence, at least 600 of defendants guns have been identified within the District's borders, and common sense compels the conclusion that there are many more here than legitimately registered or confiscated. *See Gatewood v. Fiat Spa*, 199 U.S.App.D.C. 238, 617 F.2d 820, 827 (1980) (where there were Fiat dealers in nearby Maryland and Virginia distributed vehicles also were bought by District of Columbia residents).

In *Worldwide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297–298, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), the Supreme Court declared that where

the sale of the product of a manufacturer or distributor ... is not simply an isolat-

ed occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its products in other States, it is not unreasonable to subject it to suit in one of those states if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum state does not exceed its powers under the Due Process clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by the consumers in the forum state.

The foreign manufacturer and importer who are at the start of a nationwide distribution scheme cannot claim surprise at being called to answer in any state where they are actually successful in their efforts to disburse their products. *Id., see Nelson v. Park Industries, Inc.,* 717 F.2d 1120, 1125 (7th Cir.1983), *cert. denied sub nom., Bunnan Tong & Co. v. F.W. Woolworth Co.,* 465 U.S. 1024, 104 S.Ct. 1277, 79 L.Ed. 2d 682 (1984), *Poyner v. Erma Werke GmbH,* 618 F.2d 1186, 1190 (6th Cir.1980), *cert. denied sub nom., Insurance Co. of North America v. Poyner,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). H. Cummins, "In Personam Jurisdiction", 63 Mich.L.Rev. 1028, 1035 (1965) ("the sale of products to a consumer is a contact that is purposefully sought by the manufacturer; if the cause of action arises from such activity, the manufacturer should be subject to suit wherever this endeavor is accommodated.")

The Court must assess each defendant's contacts with the forum individually. *Rush v. Savchuk,* 444 U.S. 320, 322, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980). Roehm has been sending its products into the stream of commerce in the United States, through its importer, RG Industries, for at least a decade. The officers of Roehm and RG are the same persons. Roehm cannot seriously contend that it has no knowledge or intention of its guns being sold to as many United States consumers as possible. *Nelson v. Park Industries, supra,* (foreign manufacturer and distributor of sleepwear who had longstanding business relationship with United States chainstore aware of its national marketing system, and thus subject to jurisdiction of Wisconsin courts).

Through RG, Roehm products have been advertised in nationally circulated publications. RG serves over 140 wholesalers nationwide, and .5% of its 1982 sales where made in the District of Columbia metropolitan area. Moreover, there is some support in the record to indicate that defendants stand ready to serve customers in the District of Columbia. Under the circumstances, where defendants contacts with the forum were "neither fortutious nor passive given the nature of national advertising [and a nationwide marketing scheme], the intent one can impute to a company that uses it, and the defendants real or constructive knowledge of where a plaintiff resides ... a defendant should expect to be sued in the state where the injured party is a citizen and where the tort allegedly occurred." *Fanelli v. Bodyscience, Inc.,* 540 F.Supp. 111, 114 (E.D.Pa.1982). *See also, Rockwell International Corp. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.,* 553 F.Supp. 328, 330 (E.D.Pa.1982).

It is inconsequential to the Due Process analysis that the forum provides but a drop in the bucket of a defendant's national revenues. *See,* e.g., *German Wine, supra,* 207 U.S.App.D.C. at 381, 647 F.2d at 206 ($747.20 was 1.3% of national revenues), *Keeton v. Hustler Magazine, supra,* 104 S.Ct. at 1477.

Nor does it matter that defendants' products reached the jurisdiction indirectly, so long as they have not sought to curtail their access to this market. *German Wine,* 207 U.S.App.D.C. at 380, 647 F.2d at 205. *Gatewood v. Fiat,* 199 U.S.App.D.C. at 245, 617 F.2d at 827. For the same reason, it matters not that the District has sought to ban handguns. The jurisdictional inquiry properly focuses on the actions of the *defendant. Worldwide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. By enacting laws to protect its citizens from gun-related crimes, *see McIntosh v. Washington,* 395 A.2d 744, 754 (D.C.App. 1978), the District did not forfeit its inter-

est in providing a forum in which to hold the manufacturers and distributors of handguns answerable for injuries occuring within its borders. To the contrary, it expressed a special interest in a subject of concern to every state. *Accord, Poyner v. Erma Werke, GmbH, supra* at 1192. This legitimate interest [in holding defendants answerable for injuries occurring within its borders] is a factor entitled to special weight in determining whether it is reasonable and fair for the Court to assert its jurisdiction. *Keeton v. Hustler,* 465 U.S. 770, 104 S.Ct. at 1479, *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980), *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), L. Brilmayer, "How Contacts Count: Due Process Limitations In State Court Jurisdiction", 1980 Supreme Ct.Rev. 77, 106, H. Lewis, "A Brave New World for Personal Jurisdiction: Flexible Tests Under Uniform Standards", 37 Vand.L.Rev. 1, 20 (1984) ("defendant's contacts are non-exhaustive predictor of the broader criterion of expectation").

The defendants have attempted to characterize the entry of their guns into the District as the unforseen, fortuitous acts of criminals. Plaintiffs have alleged that they were injured by the defendants failure to control distribution of their products to the criminal element, and for failure to warn that handguns are illegal in the District of Columbia. Plaintiffs' injuries were inflicted in the District by an attempted assassin, who used a gun manufactured by the defendants, and who illegally imported it here. Under the "substantive relevance" test, as it was articulated by Professor Brilmayer, 1980 Supreme Ct.Rev. at 82, and applied by the Supreme Court in *Keeton,* such a "geographical qualification of fact relevant to the merits" or "forum occurrence which would ordinarily be alleged as part of the cause of action", *id,* properly factor into the jurisdictional equation, and make it fair for the "court to impute to the defendant an expectation of suit" here. Lewis, 37 Vand.L.Rev. at p. 18, n. 75.

Moreover, even if plaintiffs were proceeding solely on a strict liability theory,

the fact that guns entered the District illegally would not relieve the defendants of the responsibility to defend here. They have purposefully availed themselves of the widest possible market, and taken no steps to curtail distribution here. Some of their guns are here legitimately, and defendants have indicated no unwillingness to cease serving those customers here who are legally able to purchase their guns. *See German Wine,* 207 U.S.App.D.C. at 380, 647 F.2d at 205. As stated previously, it is the defendant's actions to which the Court looks. It is unreasonable for them to assume that because the District has attempted to control handgun distribution, that they are relieved of accountability to its courts.

Moreover, exercise of jurisdiction is still substantively related to a strict liability theory whether or not the gun entered the District fortuitously, because privity is not required in product liability actions. *Singer v. Walker,* 21 App.Div.2d 285, 250 N.Y. S.2d 216 (1964), *aff'd Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), *cert. denied Estwing Mfg. Co. v. Singer,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965), 63 Mich.L.Rev. at 1035, n. 27.

Having determined that the exercise of this Court's jurisdiction over Roehm and RG is not offensive to the Due Process clause, the Court must decide whether the District's long arm statute reaches to these defendants.

**B.** *The Long–Arm Statute, D.C.Code § 13–423(a)(4)*

■ The section of the District of Columbia long arm statute at issue authorizes the assertion of jurisdiction over a defendant who

> caus(es) tortious injury in the District of Columbia by an act or omission outside of the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed, or services rendered

in the District of Columbia[.] D.C.Code Ann. § 13–423(a)(4).

While section (a)(1) of the long arm statute has been interpreted as consistent with the limits of the due process clause, there has been no judicial determination of the reach of section (a)(4) by a District of Columbia court. *German Wine,* 207 U.S.App.D.C. at 379–380, n. 10, 647 F.2d 204–205, n. 10., *Steinberg v. International Criminal Police Organization,* 217 U.S.App.D.C. 365, 369, n. 7, 672 F.2d 927, 931 n. 7 (1981).

The District's long arm statute was derived from the Uniform Interstate and International Procedure Act, *see,* H.R.Rep. No. 907, 91st Cong.2d Sess. 61 (1970), S.Rep. No. 405, 91st Cong. 1st Sess. 35 (1969), which was intended to reflect developments in the case law with respect to the due process limits on extraterritorial jurisdiction. 13 Uniform Laws Ann. 463, 468 (1980). The requirements of each of the sections, taken as a whole, are an attempt to codify the kinds of activity which evince constitutionally sufficient minimum contacts. Thus "substantial revenue" means enough revenue to indicate a commercial impact in the forum, such that a defendant fairly could have expected to be hauled into court there. It is incorrect to equate the " 'idea of commercial impact on the forum with the narrower concept of financial gain or loss in the forum.' *Davis H. Elliot Co. v. Caribbean Utilities, Co.,* 513 F.2d 1176, 1181 (6th Cir.1975) (per curiam)". *Health Care Industries, Inc. v. Logan Park Care Center, Inc.,* 573 F.Supp. 360, 363 (S.D.Oh. 1983).

What is substantial revenue will fluctuate with the facts of each case, depending upon the quality and nature of the contacts. Where defendant's contact with the forum has been an isolated occurrence, a larger amount of revenue from the single transaction may be sufficient to show the defendant had a significant impact on the forum, such that it would be fair to require him to return and defend on a cause of action arising out of that transaction. *Ajax Realty Corp. v. J.F. Zook, Inc.,* 493 F.2d 818 (4th Cir.1972) ($37,000 although ½ of 1% of sales, was substantial revenue), *cert. denied* sub. nom. *Durell Products,*

*Inc. v. Ajax Realty Corp.,* 411 U.S. 966, 93 S.Ct. 2148, 36 L.Ed.2d 687 (1973), *Gordonsville Industries Inc. v. American Artos Corp.,* 549 F.Supp. 200, 204 (W.D.Va.1982), *Benn v. Linden Crane, supra, Liberty Mutual Ins. Co. v. American Pecco Corp.,* 334 F.Supp. 522, 524 (D.D.C.1971) (single crane, worth ⅛th of U.S. revenues), *Johnson v. Equitable Life Assur. Soc.,* 22 App. Div.2d 138, 149, 254 N.Y.S.2d 258, 260 (1st Dept.1964), *affd.* 18 N.Y.2d 933, 277 N.Y.S. 2d 136, 223 N.E.2d 562 (1966). It would not be fair to hold him accountable on an unrelated cause of action.

Likewise, where a commercial defendant has frequently distributed inexpensive items in the forum, as for example magazines, e.g., *Akbar v. New York Magazine Co.,* 490 F.Supp. 60 (D.D.C.1980) (.7% of national sales is substantial revenue), *Stabler v. New York Times Co.,* 569 F.Supp. 1131 (S.D.Tex.1983) (.0046% of sales), *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (reversing determination that less than one percent of revenue derived from "the New Hampshire tail's too small to wag so large an out of state dog", *see Keeton v. Hustler Magazine, Inc.,* 682 F.2d 33, 36 (1st Cir. 1982).), *Curtis Publishing Co. v. Birdsong,* 360 F.2d 344, 352 (5th Cir.1966). The long arm statute does not require that the manufacturer and distributor have sold them directly to persons in the District. *Gatewood v. Fiat S.p.A., supra* 199 U.S.App.D. C. at 245, 617 F.2d at 827 (1980) (2% of sales in metropolitan area, although no sales directly in the District, compelled conclusion substantial revenue was derived from cars used in the District, when combined with registration statistics).

Moreover, the focus is on the quality, quantity and *nature* of the contacts, *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 160, taken in the aggregate, in determining whether jurisdiction is authorized. Thus a commercial defendant who deals in handguns should expect to be held accountable on a lesser showing than one who sells something as harmless as rubberbands. It is the type of products in which the state will have an inherent interest. *Poyner v.*

*Erma Werke GmbH,* 618 F.2d at 1192, *McIntosh v. Washington, supra* 395 A.2d at 754.

Lastly, although the defendants' guns have entered the jurisdiction illegally, it is important to note that they took the initiative in instituting a national marketing scheme to obtain the widest possible market for their products. Their presence in the District is only "a continuation of the flow of defendants' economic endeavors." 63 Mich.L.Rev. at 1033. Their situation can be distinguished from the regional distributor in Worldwide Volkswagon, who only undertook to serve the New York, New Jersey, and Connecticut area. Here, defendants have had "all the same benefits to be derived from having customers in the forum state as if it had sold directly to these customers." *Certisimo v. Heidelberg Co.,* 122 N.J.Super. 1, 298 A.2d 298, 304 (Law Div.1972), citing *Hoagland v. Springer,* 75 N.J.Super. 560, 590, 183 A.2d 678, 683 (App.Div.1962), *affd.* 39 N.J. 32, 186 A.2d 679 (1962). As the latter court noted "to conclude otherwise would ... permit (the manufacturer) to receive the fruits of its New Jersey activities without the attendant liabilities which should go with it."

As one commentator has stated, there can be no unfairness in forbidding the manufacturer to disassociate himself from his product, while providing him with an opportunity to defend its integrity and maintain its economic success. H. Cummins, "In Personam Jurisdiction", 63 Mich.L.Rev. 1028 at 1032 (1963).

The Court concludes that on the facts of this case, where defendants derived approximately $3000.00 from the sale of over 600 guns, retailing at $50.00 each, which have been used in the District of Columbia sufficient minimum contacts exist, as evidenced by the application of the substantial revenue provision of the long arm statute, to support the exercise of this court's jurisdiction over these defendants.

The Court is buttressed in its conclusion by the decisions of Maryland and Virginia courts, which have interpreted § (a)(4) as coextensive with the due process clause.

*Lamprecht v. Piper Aircraft Corp.,* 262 Md. 126, 277 A.2d 272, (1971), *Geelhoed v. Jensen,* 277 Md. 220, 352 A.2d 818 (1976), citing *Krashes v. White,* 275 Md. 549, 341 A.2d 798 (1975), *Marston v. Gant,* 351 F.Supp. 1122, 1125 (E.D.Va.1972), *John G. Kolbe, Inc. v. Chromodern Chair Co.,* 211 Va. 736, 180 S.E.2d 664, (1971), citing *Carmichael v. Snyder,* 209 Va. 451, 456, 164 S.E.2d 703, 707 (1968). In adopting the Uniform Interstate and International Procedure Act, Congress indicated that guidance was to be drawn from the Maryland and Virginia courts, since they had enacted the same legislation. 13 Uniform Laws Ann. 463, 468 (1980). The Sixth Circuit has also interpreted a similarly worded statute as extending to the full limits of the due process clause. *Poyner v. Erma Werke CmbH, supra, cert. denied,* sub. nom. *Insurance Co. of North America v. Poyner,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

## II

*Motion to Transfer to the Northern District of Texas.*

■ The defendant has the burden of proving forum non conveniens. *Crown Oil & Wax Co. v. Safeco Co.,* 429 A.2d 1376, 1380 (D.C.App.1981). The Court must

1. determine whether an adequate alternative forum exists

2. weigh the private interests of the parties, including but not limited to the ease, expedition, and expense of trial in the proposed forums; the relative ease and access to proof; the availability and cost of compulsory process; the enforceability of judgment once obtained, the evidence of vexatious harrassment by the defendant, and must give due deference to plaintiff's choice of forum. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)

3. if the Court finds the private interests to be in equipoise, then it considers the public interests involved; i.e., judicial economy, court congestion, and the state's interest in providing a forum, and

4. whether the plaintiff can reinstate their suit in the alternative forum without undue inconvenience or unfairness. *Pain v. United Technologies, Corp.*, 205 U.S.App.D.C. 229, 238–239, 637 F.2d 775, 784–785 (1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

■ Although Texas would provide an adequate alternative forum, the Court finds that the balance of private interests weighs heavily in favor of entertaining this action in the District of Columbia. The only hardship which defendants have shown is the inability to join the retailer in this action, and their inability to obtain compulsory process over unidentified witnesses to the sale. The Court notes that in either forum it will be impossible to join all of the conceivable defendants. In Texas neither party could obtain process over defendant Hinckley. The deposition of the retailer has been taken, and will be available to defendants for use at trial.

The overwhelming majority of witnesses and records relating to this case are here. Plaintiffs have retained permanent injuries from this incident, which require proximity to their doctors. They would incur substantial expenses in transporting their witnesses, and possibly medical attendants, to Texas. Defendant Hinckley is institutionalized in St. Elizabeth's hospital, which is within the reach of the compulsory process of this Court.

The burden to defendants of appearing here starkly contrasts with that to the plaintiffs of prosecuting this action in Texas. Defendants have shown no financial hardship to them in bringing one or two witnesses here. If they cannot bring the retailer here in person, his deposition is available for use at trial. Defendants also benefit from the witnesses and records located here.

The Court finds that defendants have failed to meet their burden of proving venue is more proper in Texas. The motion to transfer will be denied.

### III

Having concluded that the Court has jurisdiction over the two corporate defendants, and further, that the action should not be transferred to the Northern District of Texas, the Court must now determine whether the plaintiffs have stated a claim against RG Industries, Inc. and Roehm GmbH for which relief can be granted.

In asserting that the above defendants are liable, the plaintiffs argued four theories; (1) that the handgun used by Hinckley was defectively designed because the risk of harm outweighed its social utility, (2) that the distribution of the handgun was defective because defendants failed to take adequate steps to insure that the gun was not purchased by a dangerous person or used in a criminal manner, (3) that the defendants failed to warn of the dangers inherent in criminal misuse of the handgun, and finally, (4) that the sale and distribution of a handgun is an ultrahazardous activity. It appears that the plaintiffs also seek to assert a new theory based on the decision on *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143 (1985), in which the court concluded that there was a cause of action under a category entitled, "Saturday Night Specials."

With respect to the original theories asserted by the plaintiffs, the Court concludes that they lack merit and would not support a claim against the defendants. One case relied on by the plaintiffs, *Richman v. Charter Arms Corp.*, 571 F.Supp. 192 (E.D.La.1983), has been overruled. *Perkins v. F.I.E. Corp.*, 762 F.2d 1250 (5th Cir.1985). The overwhelming weight of authority rejects the plaintiffs' arguments. *See e.g. Moore v. R.G. Industries, Inc.*, 785 F.2d 316 (9th Cir.1986), *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200 (7th Cir.1984); *Patterson v. Rohm Gesellschaft*, 608 F.Supp. 1206 (N.D.Tex.1985); *Mavilia v. Stoeger Industries*, 574 F.Supp. 107 (D.Mass.1983); *DeRosa v. Remington Arms, Co.*, 509 F.Supp. 762 (E.D.N.Y.1981); *Rhodes v. R.G. Industries, Inc.*, 173 Ga. App. 51, 325 S.E.2d 465 (1985). Moreover, the Court notes that there was no argument in this case that the handgun was defective, or that it did not operate as intended. The gun proved to be highly accurate, as is clear from the fact that the

intended target, the President of the United States, was struck twice, and the plaintiffs were wounded. The Court concludes that the plaintiffs have failed to state a claim against the corporate defendants on the above theories.

■ The decision in *Kelley* requires some discussion because the court in that case purported to create a theory for possible recovery against a gun manufacturer or marketer. The *Kelley* court considered the four theories referred to above but rejected them and adopted the so-called "Saturday Night Special" theory. The court found that, while an attempt to impose strict liability upon manufacturers or marketers of handguns for gunshot injuries for the misuse of handguns by others, would be contrary to Maryland public policy, that Saturday Night Specials are a limited category of handguns "which clearly [are] not sanctioned as a matter of public policy." The court then reasoned that it would not be contrary to public policy to impose strict liability upon the manufacturers or marketers of Saturday Night Specials. 497 A.2d at 1153.

This Court finds no corresponding theory in the District of Columbia and concludes that such a theory would not be adopted in this jurisdiction. Moreover, the theory raises concerns which reach constitutional dimensions. The definition of Saturday Night Special as used in the theory is unclear. The effect of the theory would be, presumably, to discourage the manufacture and sale of cheap handguns, but the result would be to impose liability on some manufacturers, while not imposing liability on others even though the handguns manufactured or sold by all may be used for criminal purposes. In short, it would seem to be better for a potential victim to be shot or injured by cheap gun, than by an expensive one because in the case of the former, the victim could sue the manufacturer which no doubt would have a deeper pocket. Also, this Court wonders whether the theory discriminates against those law abiding citizens, who purchase a handgun for self defense, but who cannot afford a $200 or $300 weapon and who must resort to the purchase of a cheap handgun.

The *Kelley* court defines "Saturday Night Special" as "generally characterized by short barrels, light weight, easy concealability, low cost, use of cheap quality materials, poor manufacture, inaccuracy and unreliability." *Id.* at 1153–54. The court noted that the above characteristics render the Saturday Night Special "particularly attractive for criminal use and virtually useless for the legitimate purposes of law enforcement, sport, and protection of persons, property and businesses." *Id.* at 1154 (footnote omitted). In attempting to demonstrate that the manufacturer or marketer of a Saturday Night Special "ought to know that he is making or selling a product principally to be used in criminal activity" the court quotes a salesman as stating, "If your store [where handguns are sold] is anywhere near a ghetto area, these [Saturday Night Specials] ought to sell real well. This is most assuredly a ghetto gun." *Id.* at 1158 (matter in brackets this Court's). The salesman, giving us an indication of his background, then is quoted as stating "This sells real well, but, between you and me, it's such a piece of crap I'd be afraid to fire the thing." *Id.* at 1158 (citation omitted). The court also quoted a comment by a Police Commissioner of New York before a Senate hearing in which the Commissioner stated:

There is absolutely no legitimate reason to permit the importation, manufacturer, or sale of these weapons [Saturday Night Specials], or their parts. They are sought only by people who have illicit motives, but who may have some difficulty securing a better gun. No policeman, no Army officer, no security guard, no businessman or merchant, and no sportsman would purchase one of these weapons for any lawful purpose.

*Id.* at 1154, n. 10 (matter in brackets this Court's).

The Maryland court noted that the trial court must make an initial determination as to whether the gun is a Saturday Night Special and noted that the size of the handgun, small and concealable, is not enough

to make that determination because many expensive weapons may be of the same size. But, the Court stated that when those factors are "coupled with evidence of low cost, poor quality of materials or workmanship, unreliability, or other identifying characteristics ... [this] may be sufficient for the trial court to allow the issue to go to the trier of facts." *Id.* at 1160.

The Court observes that it pays great respect to the decision of the Maryland court, however, it does not agree with that ruling and accordingly, must decline to follow it.

The definition of "Saturday Night Special" is uncertain and may change depending upon the circumstances and facts of a given case. The definition clearly excludes the more expensive handguns on the market, but it is just as obvious that such weapons, being more accurate and more reliable are more dangerous and more likely to cause greater injury and harm. The fact that the manufacturer or marketer may make every effort to insure that the weapon does not reach the hands of a criminal makes no difference because, as the Court understands the definition, if it is eventually used in a criminal act and causes injury, the manufacturer may be liable. On the other hand, the manufacturer or marketer of the more expensive weapon is shielded from liability notwithstanding that it may not take the same precautions in keeping the weapon out of the hands of criminals.

The effect of such a ruling would be to limit the supply of cheap handguns in the marketplace. While this Court understands that the effort of the Maryland court may be to reduce the number of cheap guns available to criminals, the result is that it may reduce the number of cheap guns available to law abiding citizens as well. The court in quoting comments relating to the "ghetto" and the assertion that such cheap weapons are "ghetto guns" does not define "ghetto". Is a "ghetto" a low income area, or an area made up of persons of a particular race or nationality, or an area where there is an abnormally high crime rate, or all or some

of the above. Although the Maryland court does not attempt any definition of "ghetto", it does appear that the salesman who was quoted had very definite ideas as to what he meant by the reference to "ghetto", although he did not define the word. Other sources have defined "ghetto" as "a quarter of a city in which members of a minority, racial or cultural group live especially because of social, legal, or economic pressure." Webster's Third New International Dictionary (1976) at 955. The salesman who was quoted seems to assume that anyone residing in a "ghetto" is criminal or suspect. The fact is, of course, that while blighted areas may be some of the breeding places of crime, not all residents of are so engaged, and indeed, most persons who live there are lawabiding but have no other choice of location. But they, like their counterparts in other areas of the city, may seek to protect themselves, their families and their property against crime, and indeed, may feel an even greater need to do so since the crime rate in their community may be higher than in other areas of the city. Since one of the reasons they are likely to be living in the "ghetto" may be due to low income or unemployment, it is highly unlikely that they would have the resources or worth to buy an expensive handgun for self defense. To remove cheap weapons from the community may very well remove a form of protection assuming that *all* citizens are entitled to possess guns for defense. This may be *one* explanation why the Saturday Night Special has a high rate of sale in the low income community. It also raises a question concerning the validity of legislation or court decisions which seek to remove cheaper guns from the market place without taking similar action against higher priced weapons.

The *Kelley* decision also speaks in terms of public policy and makes reference to various legislative acts which would limit the types of gun which can be imported or manufactured. Many laws, while on their face appearing to limit the importation of Saturday Night Specials, do not really do, because other laws may allow the importation of parts of such weapons which are

thereafter assembled in this country. Where this is so, it hardly reflects a public policy against Saturday Night Specials.

All of the above suggests to this Court that what is really being suggested by plaintiffs, and indeed by many citizens, is for this Court, or courts, to indirectly engage in legislating some form of gun control. The pitfalls noted above seem to be ample evidence, however, that such legislation should be left to the federal and state legislatures which are in the best position to hold hearings and enact legislation which can address *all* of the issues and concerns as well as reflect the will of the citizens. If the governments, federal or state, feel that there should be strict liability in the area of handguns, they are free to enact such legislation to accomplish that goal. Presumably, such legislation would apply to all guns, regardless of make or price.

This Court is aware, of course, that the District of Columbia has enacted strong gun control laws. But, the gun in question was not purchased here; apparently it was purchased lawfully in Texas. It is uncertain how the Saturday Night Special theory would affect such purchases.

Returning to the issue of the definition of a Saturday Night Special the Court notes that the *Kelley* court referred to the inaccuracy or unreliability of such weapons as a means of determining whether or not the weapon was a Saturday Night Special. *Id.* at 1154. This is a fact a trial court must take into consideration in determining whether the handgun is a Saturday Night Special. *Id.* at 1160. But here, the handgun possessed by Hinckley was tragically accurate and reliable. Is it any less of a Saturday Night Special?

The Court concludes that the Saturday Night Special theory raises serious concerns and questions. Moreover, there are constitutional implications. The Court finds that it is highly unlikely that such a theory would be adopted in the District of Columbia courts.

### IV

Taking all of the above matters into consideration, the Court concludes that the plaintiffs have failed to state a cause of action for which relief can be granted against the defendants RG Industries, Inc. and ROEHM GmbH. This being so, the case against those defendants must be dismissed.

An appropriate order has issued.