**U.S. SHIP MANAGEMENT, INC., Petitioner,**

v.

**MAERSK LINE, LIMITED, Respondent.**

**No. CIV.A. 1:05MC001.**

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 11, 2005.

---

Gordon A. Coffee, Winston & Strawn LLP, Washington, DC, for Plaintiff.

Rolf Marshall, Preston, Gates, Ellis & Rouvelas Meeds, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This petition to confirm an arbitration award is the most recent volley in a protracted battle between petitioner and respondent regarding the operating rights to certain commercial ships enrolled in the Maritime Security Program. Other skirmishes in this battle have erupted in various venues, including New York, North Carolina, and the District of Columbia. At issue on a threshold motion to transfer the matter to the District Court for the District of Columbia are the following questions:

(i) whether, as required under 28 U.S.C. § 1404(a), this case might have been brought in the District of Columbia, *i.e.,* whether venue and jurisdiction over the defendant are proper there; and

(ii) whether the case should be transferred to the District of Columbia "in the interest of justice," under 28 U.S.C. § 1404(a), so that it may be heard and decided by the judge already considering two related cases pending there.

For the reasons that follow, transfer of this case to the District Court for the District of Columbia is warranted.

### I.

U.S. Ship Management ("USSM"), a Delaware corporation headquartered in Charlotte, North Carolina, brings this action pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 6 & 9, for an order confirming an arbitration award in an arbitration initiated against respondent Maersk Line, Ltd. ("MLL"). MLL, a Delaware corporation headquartered in Norfolk, Virginia, is a subsidiary of A.P. Moller–Maersk, A/S ("Moller"), a maritime company based in Denmark.

In a short time, a deceptively simple contract dispute has sprouted multiple lawsuits, arbitrations, and administrative agency proceedings. A summary of the underlying dispute and the procedural history of the various related cases is necessary to frame the issues raised by the motion at bar.

## A. The Underlying Dispute

At the heart of this litigation is a contract dispute between MLL and USSM regarding operating rights to fifteen vessels enrolled in the Maritime Security Program ("MSP"). The MSP, administered jointly by the United States Maritime Administration ("MARAD") and the Department of Defense, is intended to ensure the availability of U.S. commercial ships for U.S. military use in the event of a national emergency. *See* 46 U.S.C. app. § 1187 *et seq.* More specifically, the MSP authorizes the federal government, through MARAD, to enter into MSP operating agreements to pay private contractors an annual fee of $2.1 million per vessel in exchange for the vessels' availability to the military if required for national defense or other security needs. *See* 46 U.S.C. app. § 1187a. The ships otherwise operate as commercial vessels sailing under the U.S. flag. The award of MSP contracts is made pursuant to a priority system based in part on the citizenship status of the petitioning company.[1]

In 1999, Moller (MLL's parent) acquired the international shipping business of Sea–Land Services, Inc., which included operating rights to fifteen MSP-enrolled vessels. Given the financial benefits of being an MSP contractor, MLL desired to become the MSP contractor for the transferred vessels. Yet, at the time, it was unclear whether MLL was eligible to become a transferee of these additional MSP operating agreements.[2] Thus, to facilitate the overall regulatory approval of the acquisition of Sea–Land, MARAD proposed an arrangement modeled on a previous acquisition.[3] In essence, the arrangement was as follows:

- Sea–Land owned "bareboat charters" to these vessels, which required the vessel owner (in this case various financial institutions) to retain passive title but to relinquish possession, command, and navigation of the vessels to Sea–Land;

---

1. Because the demand for MSP contracts outstrips the supply, it appears from the record that only those in the first priority class have been awarded MSP operating agreements. The first priority class includes (i) vessels owned and operated by "citizens of the United States" as defined by Section 2 of the Shipping Act of 1916, 46 U.S.C. app. §§ 802 & 803, and (ii) vessels under ten years of age owned by corporations eligible to document a vessel under the U.S. flag pursuant to 46 U.S.C. § 12101 *et seq. See* 46 U.S.C. app. § 1187a. To be eligible under the second category, known as "documentation citizens," (i) a corporation must be incorporated in the United States, (ii) its President or Chief Executive Officer must be a United States citizen, and (iii) no more than a minority of the number of its directors necessary to constitute a quorum may be noncitizens. *See* 46 U.S.C. § 12102.

2. MLL already operated four other MSP-enrolled ships as a documentation citizen. It appears from the record, however, that there was some dispute over whether MLL needed to be a Section 2 citizen, not just a documentation citizen, to qualify as a transferee of the MSP operating agreements for the fifteen vessels acquired from Sea–Land.

3. The model for this structured arrangement was the 1997 sale of American President Lines, Ltd. (APL) to Neptune Orient Lines, Inc. In that instance, because the vessels had been sold to a non-U.S. citizen, the ships owned and operated by APL were no longer eligible for MSP payments and so were placed under the control and operation of a U.S. citizen as an intermediary.

- USSM was created to assume Sea–Land's MSP operating agreements and to operate the vessels as the bareboat charterer; and

- These same ships were in turn chartered by USSM to MLL under "time charters," which permitted MLL to use the vessels, but required USSM, as owner and operator, to furnish a crew and to maintain the vessels.

With USSM as an intermediary, MLL could retain the vessels in its commercial fleet while also ensuring their eligibility for the MSP program. Also of note in this agreement is that MLL negotiated a further provision, which, according to MLL, permits it to elect to terminate the arrangement and become the MSP contractor, rather than continuing to use USSM as an intermediary, if "permitted by applicable laws and regulations" to do so.[4]

The negotiations required to settle these agreements[5] were extensive and took place chiefly in the District of Columbia. *See* Declaration of Kenneth C. Gaulden. Significantly, USSM and MLL conducted at least twenty-five (25) negotiating sessions, nineteen (19) of which were held within the District of Columbia. *Id.* At these sessions, representatives of both parties were physically present in the District and MLL's President and CEO testified in the arbitration proceedings that he was present at one session in Washington D.C. with "senior officers of USSM" that went "an entire day and through until the middle of the night," during which the framework for the time charter agreements was hammered out. *Id.*

### B. Litigation History

On April 29, 2003, MARAD, responding to an MLL request, issued an opinion letter stating that MLL was eligible to become the MSP contractor for the fifteen vessels.[6] Although the letter found MLL to be an eligible transferee, MARAD did not guarantee that approval would be granted if such an application were submitted. On April 30, 2003, in response to MARAD's finding that MLL was an eligible transferee, MLL attempted to exercise its alleged contractual right to terminate the time charter agreements and to become the MSP contractor for the fifteen vessels. Yet, USSM rejected MLL's election and refused to file the application to initiate the transfer proceeding.

Following USSM's refusal, MLL notified USSM that MLL considered USSM to be in default of the time charters. Exercising a provision in the time charters that permitted MLL to act as USSM's attorney-in-fact upon default, MLL filed a transfer application on both its own and USSM's behalf. Following the submission of this application, MARAD (i) issued a final order on June 7, 2004 approving the transfer of the MSP operating agreements to MLL, subject to certain conditions precedent, and (ii) on October 1, 2004, approved the execution of certain addenda to six of the MSP operating agreements to permit MLL to substitute six of MLL's own vessels for six of the vessels operated by USSM.

These actions have led to a series of civil actions and arbitrations as USSM has at-

---

**4.** The relevant provision of the time charters is Article 2(b)(vi).

**5.** The agreements included (i) the bareboat charter between USSM and the title holders, (ii) the time charter between USSM and MLL, and (iii) the MSP operating agreements between MARAD and USSM.

**6.** Specifically, MARAD concluded that MLL, as a documentation citizen, was eligible to enter into an MSP agreement in the same priority class as USSM, a Section 2 citizen.

tempted to block the transfer of the operating agreements. Specifically, USSM has initiated at least two arbitrations, filed two Administrative Procedure Act ("APA") actions, and filed two petitions to confirm or vacate the arbitration awards, as follows:

● *First arbitration*—In an arbitration brought by USSM against MLL and held in New York on January 20, 2004, the panel ruled by decision dated March 10, 2004 (i) that MLL's election to become the MSP contractor was proper, (ii) that USSM was in default of the time charters, and (iii) that MLL had the right to submit the transfer application to MARAD, acting on behalf of USSM as its attorney-in-fact;

● *Petition to vacate*—USSM filed a petition to vacate the arbitration award on March 31, 2004 in the Southern District of New York. The petition was denied and the arbitration award was confirmed. No appeal was filed.

● *Second arbitration*—A second New York arbitration initiated by USSM against MLL on October 25, 2004 also resulted in a decision by an arbitration panel on December 20, 2004, although the panel's decision is not entirely clear.[7] It appears that the panel, while adopting the holding of the March 10, 2004 arbitration decision, also ruled that USSM had a contractual right to veto MLL's election to become the MSP contractor under these agreements. It is this second arbitration decision that USSM seeks confirmation of here.

● *First APA action (filed in D.C.)*[8]— USSM filed an action against MARAD in

the District Court for the District of Columbia in April 2003. MLL was permitted to intervene. In this action, USSM sought to enjoin MARAD's transfer of the operating agreements first by challenging MARAD's April 29, 2003 opinion letter under the APA and later by amending its complaint to challenge on APA grounds MARAD's June 7, 2004 final order. The D.C. District Court rejected USSM's request for a preliminary injunction to enjoin MARAD from transferring the operating agreements. USSM appealed the denial of this preliminary relief to the Court of Appeals for the District of Columbia Circuit. Both this appeal and the underlying action in the D.C. District Court remain pending.

● *Second APA action (filed in North Carolina)*[9]—USSM filed a second action against MARAD in the Western District of North Carolina. In that case, USSM sought to enjoin MARAD's approval of the October 1, 2004 transfer of six MSP operating agreements from USSM to MLL. Initially, the North Carolina District Court denied MLL's motion to intervene and issued a preliminary injunction enjoining MARAD from taking any action to transfer the six MSP agreements pending resolution of the second arbitration. The Fourth Circuit granted MLL's motion to intervene, vacated the preliminary injunction, and remanded the case to the District Court to consider any other issues arising in the case "including the pending motion to transfer filed by MARAD."[10] Shortly thereafter,

---

7. All three arbitrators wrote separately and no arbitrator explicitly adopted all or any portion of the opinion of any other arbitrator.

8. *See U.S. Ship Mgmt. v. United States Mar. Admin.*, No. 03cv951 (D.D.C.).

9. *See U.S. Ship Mgmt. v. United States Mar. Admin.*, No. 04cv536 (W.D.N.C.); *U.S. Ship Mgmt. v. United States Mar. Admin.*, No. 05cv045 (D.D.C.).

10. *See U.S. Ship Mgmt., Inc. v. United States Mar. Admin.*, No. 04–2487 (4th Cir. Nov. 19, 2004) (Corrected Order).

the North Carolina District Court transferred the case to the District of Columbia.

Thus, both the first and second APA actions are now pending in the District Court for the District of Columbia, the first arbitration award has been confirmed in the Southern District of New York, and USSM is seeking to confirm the second arbitration award in this district.

MLL has filed a motion to transfer this case to the District Court for the District of Columbia, where the two related APA claims are pending. In support of this motion, MLL argues that considerations of judicial economy and federal comity militate strongly in favor of transfer under 28 U.S.C. § 1404(a). USSM responds (i) that transfer is impermissible because this case could not have been brought in the District of Columbia for lack of proper venue and personal jurisdiction over MLL in the District, and (ii) that even were transfer permissible, this case is not sufficiently related to the cases pending in D.C. to warrant deviation from the traditional deference accorded a plaintiff's choice of forum. The parties briefed the issues, a hearing was held, and as the following discussion makes clear, this case is appropriate for transfer.

## II.

 The transfer analysis properly begins with the recognition that the transfer statute, 28 U.S.C. § 1404(a), allows transfer to a transferee district only if the case "might have been brought" in that district. This threshold prerequisite must be addressed and resolved before it is appropriate to consider whether the case *should be* transferred to the transferee forum for the convenience of the parties and witnesses and in the interest of justice. To satisfy this threshold prerequisite, the movant must show that venue and personal jurisdiction would have been proper in the transferee forum. *See Hoffman v. Blaski*, 363 U.S. 335, 342–43, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960). And importantly, the party seeking transfer cannot overcome this hurdle simply by waiving these requirements as to itself. *See Hoffman*, 363 U.S. at 343–44, 80 S.Ct. 1084.[11] Accordingly, the threshold issue is whether personal jurisdiction and venue would have been proper had USSM filed this petition to confirm in the District of Columbia.

## A. Personal Jurisdiction

 Personal jurisdiction analysis generally requires a two-part inquiry: first, a court must determine whether service of process is authorized by the forum's applicable long-arm statute, and second, whether that service of process comports with due process. *Mouzavires v. Baxter*, 434 A.2d 988, 990 (D.C.1981) (en banc) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474, 477 (4th Cir.1993). In other words, the inquiry is (1) whether the applicable long-arm statute reaches the defendant, and then (2) whether that reach exceeds the statute's constitutional grasp. *See RZS Holdings AVV v. PDVSA Petroleos S.A.*, 293 F.Supp.2d 645, 649 (E.D.Va.2003). Because there is no applicable federal long-arm statute, jurisdiction is determined in reference to District of Columbia

---

11. As the Supreme Court noted in *Hoffman*, to permit a defendant to waive venue and jurisdiction requirements after a case is filed, "would empower a District Court, upon a finding of convenience, to transfer an action to any district desired by the *defendants* and in which they were willing to waive their statutory defenses as to venue and jurisdiction over their persons, regardless of the fact that such transferee district was not one in which the action 'might have been brought' by the plaintiff." 363 U.S. at 344, 80 S.Ct. 1084 (emphasis in original).

law. *See Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C.Cir.1991); Rule 4(k)(1), Fed.R.Civ.P. Here, MLL seeks to establish jurisdiction under D.C.Code § 13–423(a)(1), the "transacting business" prong of the District of Columbia's long-arm statute,[12] which "permits jurisdiction to the fullest extent permissible under the Due Process Clause." *Mitchell Energy Corp. v. Mary Helen Coal Co., Inc.,* 524 F.Supp. 558, 561 (D.D.C.1981) (citing *Mouzavires,* 434 A.2d 988). Thus, because the constitutional and statutory provisions are coextensive, the two usually distinct inquiries merge into a single inquiry and a bifurcated analysis is unnecessary. *See Mouzavires,* 434 A.2d at 992; *United States v. Ferrara,* 54 F.3d 825, 828 (D.C.Cir.1995).[13] Accordingly, the "transacting business" clause of § 13–423 must be interpreted in light of the well-settled constitutional principle that jurisdiction satisfies due process where the non-resident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Put differently, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

MLL argues that the extended course of negotiations in the District of Columbia that led to the time charters is, by itself, sufficient to warrant the exercise of personal jurisdiction under the "transacting business" prong of the D.C. long-arm statute. To establish personal jurisdiction under the "transacting business" prong of the D.C. long-arm statute, a plaintiff must establish two requirements. First, the defendant must transact business in the District. *See* D.C.Code § 13–423(a). And second, § 13–423(b) requires that a plaintiff's claim arise from that transacted business. D.C.Code § 13–423(b);[14] *see also Novak–Canzeri v. Saud,* 864 F.Supp. 203, 206 (D.D.C.1994). Thus, before turning to whether the negotiations in connection with the time charters are sufficient to constitute "transacting business," it must first be determined whether USSM's petition to confirm an arbitration award arises from those negotiations.

Adopting a narrow interpretation of the "arising from" requirement, USSM argues that its petition to confirm arises only from the New York arbitration, and not from

12. The "transacting business" prong of the D.C. long-arm statute provides in pertinent part as follows:
 (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—
 (1) transacting any business in the District of Columbia . . . .
 (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts in this section may be asserted against him.
 D.C.Code § 13–423.

13. Of course, in many instances both steps are necessary. *See, e.g., DeSantis v. Hafner Creations,* 949 F.Supp. 419, 422 (E.D.Va. 1996); *Chedid v. Boardwalk Regency Corp.,* 756 F.Supp. 941, 942 (E.D.Va.1991); *Herbert v. Direct Wire & Cable, Inc.,* 694 F.Supp. 192, 193 (E.D.Va.1988).

14. Subsection 13–423(b) provides that when jurisdiction is based solely on the long-arm statute "only a claim for relief *arising from* the specific acts enumerated in this section may be asserted . . . ." D.C.Code § 13–423(b) (emphasis added). Subsection 13–423(a) also provides that personal jurisdiction may be exercised for claims "arising from" the transaction of business.

the underlying time charters or the negotiations that led to the signing of those charters. Yet, it appears that the term "arising from" has not been interpreted so narrowly; instead, D.C. courts have generally interpreted the phrase broadly, reading "arising from" to mean "related to." *See Freiman v. Lazur*, 925 F.Supp. 14, 23–24 (D.D.C.1996) ("Under Section 423(b), plaintiffs' claims 'must *relate to* the particular act or transaction forming the basis for personal jurisdiction.'") (emphasis added) (quoting *Berwyn Fuel, Inc. v. Hogan*, 399 A.2d 79, 80 (D.C.1979)).[15] Indeed, one D.C. court has suggested an even broader reading of the D.C. long-arm. *See McDaniel v. Armstrong World Indus.*, 603 F.Supp. 1337, 1342 n. 3 (D.D.C.1985) (noting as persuasive Illinois' reading of "arising from" to include any claim that "lies in the wake" of defendant's contacts with the forum). Also supportive of a broad reading of "arising from" is that such a reading is consistent with an interpretation of the phrase that serves to extend the long-arm statute's reach to the limits of due process. Thus, due process requires a nexus or "relationship among the defendant, the forum, and the litigation," such that the claim may be said to "arise out of *or relate to* " the defendant's contacts with the forum.[16]

■ Given that the broader reading of the phrase is appropriate, it follows that USSM's petition to confirm arises from, because it is related to, the time charters and the negotiations that led to them. This is so because the time charters and the negotiations leading to them are the very subject of the arbitration. As counsel confirmed in argument, much of the testimony heard in the arbitration proceeding dealt with the negotiations and the time charters. Specifically, more than 100 pages of the arbitration hearing transcript are devoted to the role of the negotiations. Also pertinent is that the scope of review on a petition to confirm an arbitration award is whether the arbitration award "draws its essence from the agreement."[17] And, significantly, if an arbitrator interpreting an ambiguous written agreement plainly fails to give effect to the parties' intent, as evidenced by negotiations or other extrinsic evidence, the award may fail to draw its essence from the contract.[18] Ac-

**15.** *See also Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 785 (D.C.Cir.1983) ("[S]ection 423(b) bars claims unrelated to the acts forming the basis for personal jurisdiction.") (citing *Willis v. Willis*, 655 F.2d 1333, 1336 (D.C.Cir.1981)); *Novak–Canzeri*, 864 F.Supp. at 206 (using "related to" interchangeably with "arising from").

**16.** *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis added); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *see also Prod. Group Int'l v. Goldman*, 337 F.Supp.2d 788, 794 (E.D.Va.2004); *Precept Med. Prods., Inc. v. Klus*, 282 F.Supp.2d 381, 386–87 (W.D.N.C.2003).

**17.** *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 145 (4th Cir.1993) (quoting *Upshur Coals Corp. v. UAW, Dist. 31*, 933 F.2d 225, 226, 228 (4th Cir.1991)); *see*

*also Champion Int'l Corp. v. United Paperworkers Int'l Union, Local 507*, 168 F.3d 725, 730 (4th Cir.1999) ("One way to test the validity of an arbitration award on this basis is to ask whether the award ignored the plain language of the [agreement].") (vacating award that did not draw its essence from the agreement) (citation and internal quotation marks omitted).

**18.** *See Boise Cascade Corp. v. Paper Allied–Industrial, Chem. & Energy Workers, Local 7–0159*, 309 F.3d 1075, 1081 (8th Cir.2002) ("'[I]f an arbitrator attempts to interpret a written agreement that is silent or ambiguous without considering the parties' intent, his award will fail to draw its essence from the [agreement].'") (quoting *Bureau of Engraving, Inc. v. Graphic Communications Int'l Union, Local 1B*, 164 F.3d 427, 429 (8th Cir. 1999)) (vacating awards that were inconsistent with industry practice, parties' past prac-

cordingly, consideration of the parties' arguments may involve here, as it did before the arbitration panel, examination of parol evidence to determine whether the arbitration panel fulfilled its obligation to give effect to the parties' intent. In sum, because this petition to confirm and the negotiations leading to the time charters are closely related, it is appropriate to conclude that this action arises from those contacts.

This conclusion finds further support from the fact that a narrow reading of "arising from" could lead to anomalous results. If, as USSM argues, the petition to confirm arises only from the arbitration hearing, then the situs of the arbitration would assume an importance it might not deserve. The location of an arbitration, after all, may have no connection at all to the subject of the underlying dispute; for the convenience of the parties or the arbitrator, an arbitration could be held virtually anywhere.[19] If USSM's narrow interpretation of "arising from" is adopted in this context, then a contract could be negotiated, signed, and executed in the District of Columbia, but if the arbitration were held in New York, Seattle, or Beijing, the District of Columbia long-arm statute would not reach parties that were not otherwise subject to general jurisdiction in the District of Columbia. Thus, a party could avoid being subject to jurisdiction in the forum with the strongest connection to a dispute merely by ensuring that the arbitration is held in some other forum. To be sure, if a party's connection with a forum is strong enough that he "should

reasonably anticipate being haled into court there"[20] for a breach of contract, then certainly they are strong enough that he should have to defend against the confirmation of an arbitration award concerning a claim of such a breach.[21]

Given that USSM's petition to confirm an arbitration award arises from the underlying time charters and related negotiations, the analysis next proceeds to whether the time charter negotiations conducted in the District of Columbia were sufficient to constitute "transacting business" there. MLL argues that the extended, repeated course of negotiating sessions in the District of Columbia leading to the signing of the time charters constitutes "transacting business" in the District and should warrant the exercise of jurisdiction over MLL for any claim arising out of the time charters. In response, USSM argues that negotiations, by themselves, are not sufficient to constitute transaction of business. Rather, USSM urges that to have transacted business in the District of Columbia, the parties would have had to sign or execute the time charters there.

■ To be sure, a single negotiation session that is insignificant in the overall course of the parties' dealings is insufficient to constitute transaction of business. See, e.g., Mitchell Energy Corp. v. Mary Helen Coal Co., 524 F.Supp. 558, 563 (D.D.C.1981) (holding that single meeting in District of Columbia not sufficient to constitute "transacting business" when insignificant to parties' dealings and agreement already being performed at time of meeting).[22] Yet, it does not follow that an extended course of contract negotiations,

tices, parties' negotiating history and other extrinsic evidence of intent).

**19.** It is worth noting that although the time charters provide that New York shall be the location of all arbitrations, the parties initially agreed to hold this arbitration in Washington D.C., but later agreed to move it to New York for the convenience of the arbitrator.

**20.** World–Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. 559.

**21.** It is also worth noting that subject matter jurisdiction to hear USSM's petition to confirm in federal court is grounded not in the fact that this claim arises from an arbitration, but rather that the underlying dispute relates to maritime contracts. See 28 U.S.C. § 1333.

**22.** Of course, this does not mean that a single

significant to the parties' dealings, also cannot constitute transacting business. Indeed, the contrary is true; as *Mitchell* teaches, a "course of [contract] negotiations" or a single meeting that is not "insignificant in the scheme of the parties' dealings" is sufficient.[23] Moreover, in *Fregata Shipping Co. v. Star Carriers, S.A.*, 1987 WL 8716 (D.D.C.1987), the court explicitly found a course of negotiations was sufficient to constitute transacting business in the District of Columbia. There, the court upheld jurisdiction based solely on the course of negotiations involving plaintiff, defendant, and an agency of the United States government, where it was clear that the meetings were an "essential step in the negotiations process," and led "directly" to the agreement ultimately signed. *Id.* (citing *Mitchell Energy Corp.*, 524 F.Supp. at 562). In reaching this conclusion, the *Fregata* court stated that,

> Contract negotiations in a forum state, "even where the defendant has no other contacts," can subject a defendant to the forum state's jurisdiction, particularly if the negotiations *involve a course of sessions* or are "combined with a continuing series of letters and telephone calls to the forum."

*Id.* at *5 (citing *Mitchell Energy Corp.*, 524 F.Supp. at 563) (emphasis added).

■ In this case, therefore, it is clear that MLL's extended course of negotiations conducted in the District of Columbia in connection with the time charter agreements was sufficient to constitute "transacting business" there. The contract, which is the subject of the arbitration at issue here, was negotiated almost entirely in the District of Columbia. Of 25 negotiating sessions, fully 19 of them were held in the District of Columbia with the parties *physically present.* Many of these sessions also involved MARAD. As quoted in the transcript of the arbitration proceeding, MLL's President and CEO testified that he was present at a session in Washington D.C. with "senior officers of USSM" that went "an entire day and through until the middle of the night" during which the entire framework for the agreement was hammered out. *See* Arbitration Hearing Transcript, 126–27. Different from the single, "insignificant" meeting in *Mitchell* and similar to the course of negotiations conducted in *Frigata*, the negotiation sessions at issue here were an "essential step in the negotiations process" and "led directly" to the terms of the time charters.[24]

---

negotiation session, if central to the course of negotiations, could not be sufficient to constitute transaction of business. Indeed, as the District of Columbia Court of Appeals has recognized, "under certain circumstances, a single act may be sufficient to constitute transacting business." *Mouzavires*, 434 A.2d at 992 (cited in *Mitchell Energy Corp.*, 524 F.Supp. at 563).

**23.** *See Mitchell Energy Corp.*, 524 F.Supp. at 563–64 (citing *Doyn Aircraft, Inc. v. Wylie*, 443 F.2d 579 (10th Cir.1971); *Data Disc, Inc. v. Systems Tech. Assoc. Inc.*, 557 F.2d 1280 (9th Cir.1977); *McLaughlin v. Copeland*, 435 F.Supp. 513 (D.Md.1977)).

**24.** At oral argument, USSM also cited *Freiman v. Lazur*, 925 F.Supp. 14 (D.D.C.1996) in support of its conclusion that negotiations, by themselves, are not sufficient to constitute

transaction of business. *Freiman* is factually distinguishable as that court merely concluded that a *single meeting*, was not a "substantial connection with the forum" sufficient to warrant a finding of "transacting business" when (i) the contract was executed and performed outside of the District of Columbia, (ii) the defendants, including the defendant government agency, did not have offices in the District, and (iii) all of the parties resided and worked outside of the District of Columbia. *Id.* at 25–26. Yet, the court in *Freiman* also concluded that a single meeting was not "qualitatively significant" and that it did not rise to the level of a comparatively significant contact in the parties' course of dealing. *Id.* Quite to the contrary, the parties' negotiations in Washington D.C. in this case consisted not of a single meeting, but a course of nineteen sessions. Moreover, the meetings were "com-

As such, MLL's contacts with the District of Columbia clearly amount to "transacting business" there. And because USSM's claim in this case arises from those contacts, the District Court for the District of Columbia could properly exercise jurisdiction over MLL to hear this claim.[25]

## B. Venue

The next step in the § 1404(a) analysis is to determine whether venue would have been proper had USSM filed its petition to confirm the arbitration award in the District Court for the District of Columbia.

 To begin with, it is important to note that venue in an action to confirm an arbitration award may be established either under the FAA's special venue statute or under the general venue statute. *See Cortez Byrd Chips v. Bill Harbert Constr. Co.*, 529 U.S. 193, 197, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000) (reading FAA's special venue provisions permissively to conclude that they supplement, but do not supplant, the general venue provision).[26] There are, therefore, a number of ways in which venue can be satisfied in the case of a petition to confirm an arbitration award. In this instance, however, it is unnecessary to consider each of them as it is unmistakably clear that one of the general venue options is satisfied.

Under the general venue statute, venue is proper in a judicial district "where any defendant resides, if all defendants reside in the same State." *See* 28 U.S.C. § 1391(b)(1).[27] And under § 1391(c), a de-

---

paratively significant" as the parties "hammered out" most of the contract terms during these sessions.

**25.** MLL also argues in the alternative that USSM's petition to confirm an arbitration "might have been brought" in the District of Columbia because MLL had already consented to jurisdiction as an intervenor in two related cases brought there. Of course, it is plainly not the case that by submitting to jurisdiction in one case that a party consents to all future suits against the party in that district, even if they are related. *See Mallinckrodt Med., Inc. v. Sonus Pharmaceuticals, Inc.*, 989 F.Supp. 265, 271 (D.D.C.1998) ("It would be ludicrous to suggest that [parties] consented to the jurisdiction of this Court for all time, with respect to all potential competitors, and for all purposes, simply because they once chose to sue ... here."). Yet, it may be that transfer is appropriate where, as here, the plaintiff could have joined its claim in a pending action in the transferee district. As the Supreme Court has put the rule, "[i]f when a suit is commenced, plaintiff has a right to sue in a district, *independently of the wishes of defendant*, it is a district where the action might have been brought." *Hoffman*, 363 U.S. at 344, 80 S.Ct. 1084 (emphasis added). Thus, it may be that this claim "could have been brought" by USSM in the District of Columbia at the time it was filed despite the lack of an independent basis for personal jurisdiction, because USSM could

have joined the claim against MLL under Rule 18, Fed.R.Civ.P. *See A.J. Indus., Inc. v. United States District Court*, 503 F.2d 384, 386 (9th Cir.1974) (holding that plaintiff's ability to raise claims by counterclaim in pending litigation in transferee forum satisfied the "might have been brought" requirement); *Leesona Corp. v. Duplan Corp.*, 317 F.Supp. 290, 293–94 (D.R.I.1970) (same). Nonetheless, because venue and personal jurisdiction are proper in the District of Columbia, it is unnecessary to reach or decide this alternative argument concluding that this action might have brought in the District of Columbia.

And, finally, because the requirements for specific jurisdiction are met, it is unnecessary to consider the parties' arguments with respect to general jurisdiction. *See Schwartz v. CDI Japan*, 938 F.Supp. 1, 5 (D.D.C.1996) (discussing distinction between specific and general jurisdiction).

**26.** The FAA provides that if no court is specified in the agreement of the parties, an application to confirm, vacate or modify an arbitration award may be brought in the district in which the award was made. 9 U.S.C. § 9–11. Because the award USSM seeks to confirm was made in New York, venue is not proper in the District of Columbia under 9 U.S.C. § 9.

**27.** Because subject matter jurisdiction is not founded on diversity of citizenship, § 1391(b)

fendant that is a corporation is deemed to "reside" in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. Because it has already been established that personal jurisdiction over MLL is proper in the District of Columbia, it follows that venue is also proper there. Accordingly, it is clear that USSM's petition to confirm could have been brought in the District Court for the District of Columbia and thus the § 1404(a) analysis properly proceeds to whether the action should be transferred there.

## C. Transfer of Venue

 A district court may transfer a civil action to any other appropriate district court "for the convenience of parties and witnesses, [and] in the interest of justice ...." 28 U.S.C. § 1404(a). The decision whether to transfer is committed to the sound discretion of the district court. *Southern R. Co. v. Madden,* 235 F.2d 198, 201 (4th Cir.1956); *Verosol B.V. v. Hunter Douglas, Inc.,* 806 F.Supp. 582, 589 (E.D.Va.1992). In determining whether to grant a motion to transfer under § 1404(a), a court considers and balances a variety of factors, including the convenience of the parties and witnesses; the

cost of obtaining the attendance of witnesses; the availability of compulsory process; the interest in having local controversies decided at home; in diversity cases, the court's familiarity with the applicable law; and the interest of justice.[28] In balancing the relevant factors, there is "ordinarily a strong presumption in favor of the plaintiff's choice of forum." [29] Nevertheless, this principle is not conclusive; rather, a plaintiff's choice of forum is not entitled to substantial weight if the plaintiff chooses a foreign forum, or the cause of action bears little or no relation to that forum.[30]

USSM relies heavily on the preference afforded a plaintiff's choice of forum to challenge MLL's motion to transfer this case to the District of Columbia. Yet, USSM did not file this case in its home forum of the Western District of North Carolina, nor does it allege any connection between the Eastern District of Virginia and the operative facts of this case. Of course, MLL is headquartered in this district, but MLL's presence here does not increase the convenience to USSM of trying the case here, which is the relevant consideration in according plaintiff's choice of forum presumptive weight. Further, USSM has already filed related actions in

---

is the relevant venue provision. *See* 28 U.S.C. § 1391(b).

**28.** *Verosol B.V. v. Hunter Douglas, Inc.,* 806 F.Supp. 582, 592 (E.D.Va.1992); *see also Board of Trustees, Sheet Metal Workers Nat'l Fund. v. Baylor Heating & Air Conditioning, Inc.,* 702 F.Supp. 1253, 1256 (E.D.Va.1988); *Eastern Scientific Marketing, Inc. v. Tekna–Seal, Inc.,* 696 F.Supp. 173, 180 n. 13 (E.D.Va.1988). For a convenient summary of all the factors relevant to the § 1404(a) transfer analysis and the cases discussing these factors, *see Questions as to convenience and justice of transfer under forum non conveniens provision of Judicial Code,* 1969 WL 20096, 1 A.L.R. Fed. 15 (1969).

**29.** *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981);

*see also Verosol B.V.,* 806 F.Supp. at 592; *Tekna–Seal,* 696 F.Supp. at 179 ("Plaintiff's privilege to choose, or not to be ousted from, his chosen forum is highly esteemed.") (citation and internal quotations omitted).

**30.** *Production Group Int'l v. Goldman,* 337 F.Supp.2d 788, 799 (E.D.Va.2004); *GTE Wireless, Inc. v. Qualcomm, Inc.,* 71 F.Supp.2d 517, 519 (E.D.Va.1999); *Verosol B.V. v. Hunter Douglas, Inc.,* 806 F.Supp. 582, 589 (E.D.Va.1992); *see also Turner & Newall, PLC v. Canadian Universal Ins. Co.,* 652 F.Supp. 1308, 1310 (D.D.C.1987) ("[T]his presumption loses much of its force when the action has little relationship to the forum chosen.").

three other fora, including the Western District of North Carolina, the Southern District of New York, and the District Court for the District of Columbia, inviting an inference of forum shopping. Thus, the presumption favoring plaintiff's chosen forum should be accorded little weight if the other factors favor transfer.

Convenience of the parties and witnesses is not a significant consideration because less than ten miles separates the courthouse here from the courthouse in the District of Columbia. Thus, none of the parties can claim any significant inconvenience whether the case is tried here or there.[31]

The important consideration in the analysis here is the interest of justice, which is intended to encompass all those factors unrelated to witness and party convenience and includes such factors as "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, [and] the possibility of harassment." *Board of Trustees*, 702 F.Supp. at 1260 (citing examples); *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F.Supp.2d 517, 519 (E.D.Va.1999);

see also *Questions as to convenience and justice of transfer under forum non conveniens provision of Judicial Code*, 1969 WL 20096, 1 A.L.R. Fed. 15 (1969).

MLL cites four factors that it argues favor transfer to the District of Columbia: (i) that the same parties are currently engaged in two related actions in the District of Columbia involving the same time charter agreements and the same underlying events and facts; (ii) that Judge Leon of the District Court for the District of Columbia is already familiar with the facts and issues in this case; (iii) that the operative facts of this case occurred largely in the District of Columbia; and (iv) avoidance of congestion. USSM responds that transfer is not in the interest of justice because this case is not sufficiently related to the two APA actions pending in the District to trigger any judicial economies.

 MLL's first two arguments for transfer are related.[32] Both rely on the significant efficiency gains that would accrue from trying this case with the two related actions already pending in the District of Columbia before the same district court judge. The interest of justice weighs heavily in favor of transfer when related actions are pending in the transferee forum.[33] This is particularly so when

**31.** *See, e.g., Carlile v. Continental Airlines, Inc.*, 953 F.Supp. 169, 171 (S.D.Tex.1997) (refusing to transfer case less than fifty miles from Houston to Galveston); *Market Transition Facility v. Twena*, 941 F.Supp. 462, 467–68 (D.N.J.1996) (refusing to transfer case less than twenty miles from Newark to Brooklyn); *Hathi v. Frischer*, 645 F.Supp. 360 (E.D.Pa. 1986) (denying transfer from Pennsylvania to New York).

**32.** MLL's third factor, that the operative facts of this case occurred largely in the District of Columbia, while it bolsters slightly the case for transfer, is not by itself dispositive. The fourth factor is the avoidance of congestion in this district. And while the relative congestion of two different court's dockets may be a permissible consideration in other cases, there is no reason to conclude here that the

District Court for the District of Columbia cannot hear and resolve this case in a reasonably prompt manner.

**33.** *See, e.g., Board of Trustees*, 702 F.Supp. at 1260 n. 24 (collecting cases); *Fairfax Dental (Ireland) Ltd. v. S.J. Filhol Ltd.*, 645 F.Supp. 89, 92 (E.D.N.Y.1986) ("The pendency of a related case in the proposed transferee forum is a powerful reason to grant a motion for a change of venue") (quoting *Supco Automotive Parts, Inc. v. Triangle Auto Spring Co.*, 538 F.Supp. 1187, 1192 (E.D.Pa.1982)); *Schneider v. Sears*, 265 F.Supp. 257, 266 (S.D.N.Y. 1967) ("There is a strong policy favoring litigation of related claims in the same tribunal ...."); 17 James Wm. Moore et al., *Moore's Federal Practice* § 111.13[1][o] (3d ed.2004) (collecting cases).

the "two cases are intimately related and 'hinge upon the same factual nucleus.'" *Berg v. First American Bankshares, Inc.,* 576 F.Supp. 1239, 1243 (S.D.N.Y.1983) (citation omitted). Pendency of such a related action in the transferee forum weighs in favor of transfer, "not only because litigation of related claims in the same tribunal facilitates efficient, economical and expeditious pre-trial proceedings and discovery, but because it avoids ... [duplicative] litigation and inconsistent results." *Id.* (internal citations and quotation marks omitted). And where a party has previously litigated a case involving similar issues and facts "a court in that district will likely be familiar with the facts of the case. As a matter of judicial economy, such familiarity is highly desirable." *LG Electronics, Inc. v. Advance Creative Computer Corp.,* 131 F.Supp.2d 804, 815 (E.D.Va.2001). This is so because litigation in the same court avoids duplicative litigation where one court has already invested "substantial time and energy" in a case. *Id.*

■ In this case, two related actions are already pending in the District of Columbia, and have been assigned to the same judge, who has become familiar with the legal issues, facts, and the many twists and turns in this protracted case. This familiarity weighs strongly in favor of transferring this case to the District of Columbia so that all aspects to this dispute may be resolved in a single forum. USSM argues that the APA actions pending in the District of Columbia are not related to this action because there USSM is challenging MARAD's administrative actions, whereas here it is seeking only to confirm an arbitration directly connected to the time charters. Yet, the distinction is unpersuasive. The actions pending in the District of Columbia, though they involve APA actions challenging MARAD's decision to transfer the MSP agreements from USSM to MLL, not only include MLL as a party, but are "intimately related and

hinge upon the same factual nucleus" as this case. *Berg,* 576 F.Supp. at 1243. Specifically, both the D.C. actions and this case ultimately depend on the terms of the time charters, which were signed and drafted with the approval and encouragement of MARAD. While this action relates to the interpretation of the time charters, the APA actions turn on MARAD's reliance on and interpretation of those same time charters in its decision-making process. Further, any decision made in this case may effect the outcome of the APA actions pending in D.C. For example, if the arbitration decision in this case is confirmed, and USSM is found to have an absolute right to veto MLL's application for a transfer of the MSP operating agreements, MARAD's decisions approving the transfers may ultimately be rendered moot. The potential connection between the arbitrations and the APA actions was also noted by the Fourth Circuit in the appeal of the North Carolina case. Specifically, the Fourth Circuit granted MLL's motion to intervene in that suit because USSM's arguments in that APA action were premised "in large part upon its view of the scope of Maersk's rights under the time charters." *See U.S. Ship Mgmt., Inc. v. United States Mar. Admin.,* No. 04–2487 (4th Cir. Nov. 19, 2004) (Corrected Order). To be sure, the APA actions and this case are not precisely identical. Yet, given the complex overlapping nature of the three civil actions and the interpretation of two related arbitrations, these cases will likely raise similar or identical issues, and thus will benefit significantly from being resolved together. Moreover, Judge Leon in the District of Columbia is already familiar with the issues involved in this protracted litigation and judicial economy will be served by having these related cases resolved in the same court.

■ As a final matter, defendant's argument that the "first-filed rule" plays a role here is mistaken. *See, e.g., Nutrition*

& *Fitness, Inc. v. Blue Stuff, Inc.,* 264 F.Supp.2d 357, 360 (W.D.N.C.2003) (the first-filed rule provides that "where the same parties have similar litigation in separate federal fora, doctrines of federal comity dictate that the matter should proceed in the court where the action was first filed, and that the later-filed action should be stayed, transferred, or enjoined."). The first-filed rule is generally applied only where the issues in the two cases are identical or where there is "substantial overlap" between the legal issues presented.[34] Where, as here, the case sought to be transferred is not identical, but related or similar to the cases pending in the transferee district, the first-to-rule is not the chief concern. Instead, in these circumstances, the more important consideration is judicial economy in having the same judge consider the same underlying facts and issues only once and thereby guarding against inconsistent results.

In sum, the connection between this case and the two related cases in the District Court for the District of Columbia warrants transfer to that district because plaintiff's choice of forum is entitled to little presumptive weight and trying the cases together will result in significant efficiency gains. Accordingly, the case must be transferred to the District Court for the District of Columbia.

An appropriate Order will issue.

---

34. *See TPM Holdings, Inc. v. Intra–Gold Indus., Inc.,* 91 F.3d 1, 4 (1st Cir.1996) (noting that first-filed rule typically applies where overlap between two suits is "nearly complete," but in the event the overlap is "less than complete," transfer decision requires consideration of other factors); *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997) (application of first-filed rule requires "substantial overlap" of issues); *see* *also* 17 James Wm. Moore et al., *Moore's Federal Practice* § 111.13[1][o][ii] (3d ed.2004). The Fourth Circuit has not yet adopted the "mirror image" requirement or a requirement of "substantial overlap." It is unnecessary to reach or decide this issue, however, because transfer is plainly warranted on the basis of the judicial economy gains to be had from litigating these related cases in the same forum.